## KELLER v. BAUMGARTNER.
### Civil Action No. 1478.

District Court, E. D. Wisconsin.
April 24, 1945.

Victor M. Harding and Herbert C. Hirschboeck, both of Milwaukee, Wis., for plaintiff.

Maxwell H. Herriott and Carl G. Gezelschap, both of Milwaukee, Wis. for defendant.

DUFFY, District Judge.

Plaintiff and defendant executed a written contract dated August 17, 1943. Although it was in the form of a letter addressed to the plaintiff and signed by the defendant, it was in fact prepared by the plaintiff. (The contract is set out in detail in a foot note.[1]) Plaintiff claims fees of $46,064.33, alleging he is entitled to same under the clauses of the contract providing that he receive a service fee equal to ten

---

[1] Engineering Service Agreement

Mr. William H. Keller
Keller Engineering Company
20 West Jackson Boulevard
Chicago 4, Illinois

Dear Mr. Keller:

We hereby retain your services and authorize you to represent us in connection with such services as we elect to make available to you.

We may want your assistance regarding sub-contracting, shop practice, procuring materials and such other services as you customarily render.

It is understood that any service which we make available to you will be

per cent of the gross billing on orders secured directly or indirectly through his efforts, and that subsequent orders from the same sources shall carry the same service fee. Plaintiff claims that directly or indirectly he secured orders for the defendant from nine companies, to wit, Amertorp Corporation, Automatic Products Company, Cullman Wheel Company, Dynamatic Corporation, Lear Avia, Inc., Link-Belt Company, Pullman Standard Car Manufacturing Company, Todd and Brown, Inc., and Universal Paper Products Company. If the claim is not barred by Sec. 101.31, Wis.Stats., defendant concedes that plaintiff is entitled to a service fee on orders from five of the above named companies, but denies his right to collect any fees on orders from Amertorp Corporation (St. Louis Plant), Lear Avia, Inc., Universal Paper Products Company, and the December 4, 1943, and the January 11, 1944, orders received from Pullman Standard Car Manufacturing Company.

Defendant Baumgartner operated a machine tool business at Milwaukee, known as Reliable Tool and Machine Works (hereinafter referred to as "Reliable"). At the time of the trial he had about 175 employees. In 1943 he had gross sales of $1,270,000, and in 1944 they approximated $1,000,000. Plaintiff Keller was a registered engineer in Illinois. In the spring of 1943 he solicited business from the defendant, as well as others, signing his letter "William H. Keller, President," although Keller Engineering Company, the name which was on the letterhead, was not incorporated. On April 22, 1943, Harold E. Fleming, then the defendant's director of sales, wrote Keller enclosing a tool list of Reliable's facilities and suggesting a meeting with him. On August 17, 1943, Keller appeared at the office of the defendant and presented a card describing himself as president of the Keller Engineering Company. Defendant Baumgartner was favorably impressed with Keller's statement of his qualifications. Keller then produced the document which he had prepared, which was entitled "Engineering Service Agreement," and which was signed that day.

Previous to August 17 plaintiff had some contact with Pullman Standard Car Manufacturing Company (hereinafter referred to as "Pullman"). At the time of signing the agreement Keller spoke of his intention to try to obtain Pullman business for defendant. Plaintiff thereafter delivered to Pullman a folder containing a list of Reliable's facilities, and visited the Pullman plant at Hammond, Indiana, where he met Mr. Bradley who was in charge of sub-contracting. Bradley gave Keller several prints and spec-

---

figured at prices in which we will eliminate our usual and customary selling cost.

We agree to pay you, and you agree to accept, as full compensation for your services, a service fee equal to 10% of the gross billing on orders secured directly or indirectly through your efforts, in the absence of some other predetermined basis for specific service.

Subsequent orders, from the same sources, shall carry the same service fee unless it is mutually agreed that a change in rate is to be made in any instance.

This service fee shall be advanced to you on or before the 10th of each month on the gross billing during the preceding month.

Final plus or minus adjustments shall be made on the basis of the total amount collected on such orders or portions of such orders as are completed by us and accepted by the buyer.

If and when you act in the capacity of a jobber, whereby we would manufacture and bill you direct, it is understood that we will receive our regular quoted price less our regular discount and that there will be no other service fee payable to you.

We will furnish you with up-to-date list of our plant facilities, and copies of all invoices, as shipments are made, and work progress reports, and keep you fully informed regarding all inquiries and orders received from your sources and all proposals and quotations submitted, in the interest of expediting and facilitating operations.

The term of this agreement shall be for one year from the date of your acceptance and it shall continue in full force and effect thereafter until terminated by either party on ninety (90) days written notice mailed to the last known address of the other party. Please sign and return one copy, retaining the other for your record, and oblige.

Very truly yours,

Reliable Tool & Machine Works

Per J. R. Baumgartner

Title     Owner

Accepted this 17th day of Aug. 1943

Wm. H. Keller

William H. Keller

ifications so that Reliable could submit quotations, and Keller mailed them to Reliable on August 21. Subsequently Keller made additional efforts to obtain Pullman business for the defendant. However, before plaintiff ever approached Reliable, Pullman had been on defendant's mailing list, and in the spring of 1943 Pullman contacted defendant with respect to certain router bits. Defendant's director of sales, Fleming, called on Pullman and discussed the matter. Although no orders eventuated, samples were forwarded by Pullman as late as August 30, 1943.

Shortly after the contract between plaintiff and defendant was signed, defendant submitted bids through the plaintiff to Pullman for one tool and two screw contracts. The bids on the screw contracts were rejected as being too high. Keller then submitted lower bids for the same work upon behalf of the Giddings and Lewis Machine Tool Company of Fond du Lac. Keller's explanation of such action was that he was merely testing the market.

In the latter part of October, 1943, Pullman, through Mr. Bradley, inquired by 'phone of Huber, who was defendant's production manager, as to the status of Keller. When told he was on a commission basis, Bradley advised that he would have nothing to do with Keller or with defendant's business if Keller were connected with it. In the meantime Keller had suggested that Bradley visit defendant's factory at Milwaukee. Bradley did so on November 22, 1943, at which time he again told Baumgartner that he would not deal with Reliable through Keller and that no orders would be forthcoming if Keller were to receive a commission.

Defendant told Keller by 'phone to "stay out" of Pullman, and wrote him saying: "The Pullman Company pointed out to us some while back that they would not deal through any jobber and we therefore ask that you do not represent us with this firm since you cannot possibly represent us where it is contrary to the wishes of the customer." Keller testified that nevertheless Baumgartner orally promised him a commission on any Pullman business that might be obtained, but defendant emphatically denies any such conversation. However, Keller did at all times contend that he was entitled to a commission on any Pullman business.

The first two Pullman orders received by defendant are dated November 18, 1943, and the third order is dated November 23, 1943. These were received prior to defendant's final demand that plaintiff "stay out" of Pullman. The first two orders were cancelled, but Reliable commenced shipments and billings under the third order. Defendant did not send plaintiff copies of the invoices sent to Pullman or otherwise notify him that such orders had been received. On December 4, 1943, Reliable received a fourth Pullman order amounting to $98,943.02, and on January 11, 1944, a fifth order totaling $53,550. Plaintiff likewise received no notice from defendant of the receipt of these orders.

Keller frequently complained to the defendant because of its failure to furnish him with copies of inquiries, orders, invoices, etc. While Keller received some payments on account, he insisted additional compensation was due him. On January 20, 1944, he started suit against the defendant in the Circuit Court of Milwaukee County alleging that more than $15,000 was due to him, and he garnisheed defendant's bank account. Baumgartner thereupon invited plaintiff to come to the office and examine Reliable's records. Plaintiff, his attorney, and his accountant visited the Reliable plant on January 29, 1944, and Baumgartner introduced them to Mr. Frieseke, the controller. The accountant asked to see all open orders and Frieseke gave him the open order file, from which, together with the invoice billing register, a statement was prepared purporting to show the total merchandise invoiced to Keller's accounts and also the amounts still on order. The statement failed to reveal any amounts "on order" with the Pullman Company. No information was given to plaintiff about the two large orders that had been received from Pullman. The statement contained a computation of the commissions owing to plaintiff. The accounts listed in the statement were Amertorp Corporation (St. Louis Office), Dynamatic Corporation, Link-Belt Company, Todd and Brown, Inc., Universal Paper Products Company, and Cullman Wheel Company. The commission at ten per cent, less amounts theretofore paid, amounted to $562.81. At the same time Baumgartner prepared a statement addressed to plaintiff saying in part:

"Agreeable with our understanding of today, we are handing you herewith our check

in the amount of $562.81 in payment of commissions due you to date on billings on orders secured through your efforts."

Without knowledge of the two large orders from Pullman, plaintiff accepted the check and thereafter dismissed the suits then pending in the Circuit Court.

In Baumgartner's statement to plaintiff, the following also appeared:

"It is understood that from now on you will receive copies of inquiries, quotations, work progress reports, shipping memos, and invoices in connection with any other business secured through your efforts in accordance with the terms of our contract of August 17, 1943.

\* \* \* \* \* \*

"As of this date according to our records, we have on hand unfilled orders as follows:

| | | |
|---|---|---|
| Amertorp Corporation | $ | 611.00 |
| Dynamatic Corporation | | 945.00 |
| Link Belt Company | | 35,248.41. |
| Cullman Wheel Company | | 1,600.00 |

"You will be entitled to 10% service fee on all of these orders excepting Link Belt on which you will receive 5%."

Plaintiff soon again became suspicious and demanded work progress reports and delivery schedules. On February 22, 1944, plaintiff wrote inquiring what orders were received from and what shipments had been made to Pullman. Reliable's answer of February 23 made no mention of the two large orders from Pullman, and also failed to mention that on February 19, 1944, a shipment and invoice of $1,495.00 had been made to Pullman on their order of November 23, 1943. It likewise failed to disclose eight billings to Amertorp Corporation between January 29, 1944, and the date of Reliable's letter. Defendant's answer made some explanation and plaintiff wired that same was not acceptable to him. On February 28, 1944, Baumgartner wired plaintiff that he was cancelling the contract "effective immediately." On the following day Reliable commenced shipments on the two large Pullman orders.

Keller had meanwhile obtained an order from Todd and Brown, Inc., who had requested that Keller bill them. Reliable desired to make the billing and some correspondence followed as to the proper method. Todd and Brown did not desire to change their original arrangement and remittance was made to Keller in the sum of $724. Keller wrote to defendant that he would withhold this remittance until he was satisfied defendant was living up to the contract. He has not at any time remitted this payment or any part thereof to the defendant.

Sec. 101.31(1) of the Wisconsin Statutes provides in part:

"\* \* \* and it shall be unlawful for any person to practice or to offer to practice \* \* \* the profession of professional engineering in this state, or to use in connection with his name or otherwise assume, use or advertise any title or description tending to convey the impression that he is \* \* \* a professional engineer or to advertise to furnish \* \* \* professional engineering services, unless such person has been duly registered or exempted under the provisions of this section.

\* \* \* \* \* \*

"(c) The term 'professional engineer' as used in this section means a person who by reason of his knowledge of mathematics, the physical sciences and the principles of engineering, acquired by professional education and practical experience, is qualified to engage in engineering practice as hereinafter defined.

"(cm) The practice of professional engineering within the meaning and intent of this section includes any professional service, requiring the application of engineering principles and data, wherein the public welfare or the safeguarding of life, health or property is concerned and involved, such as consultation, investigation, evaluation, planning, design, or responsible supervision of \* \* \* operation, in connection with any \* \* \* machines, equipment, processes, \* \* \*."

Defendant contends that the contract in suit is void under this statute and points out that its title, "Engineering Service Agreement," indicates Keller was being hired for engineering services. Defendant also points out the contract contained the provision, "We may want your assistance regarding sub-contracting, shop practice," and contends that shop practice comes within the definition of professional engineering services.

The name which the parties give to an instrument is not controlling in an interpretation of it. Shepard v. Pabst, 149 Wis. 35, 135 N.W. 158; Drovers' Deposit National Bank v. Tichenor, 156 Wis. 251, 145 N.W. 777. Likewise when a contract is ambiguous the practical construction by the parties

thereto may be considered in interpreting same. Milwaukee County v. Badger Chair and Furniture Co., 223 Wis. 118, 269 N.W. 659; Crolius v. Lorge, 192 Wis. 130, 212 N.W. 253. Defendant argues that since Keller prepared the agreement, if ambiguous it must be construed against him. While it is well established that in case of an ambiguity, a contract will be construed against a party who prepared same, Schuhknecht v. Robers, 192 Wis. 275, 212 N.W. 657, it is just as well established that every part of a written instrument should be given effect so far as possible, Polebitzke v. John Week Lumber Co., 163 Wis. 322, 158 N.W. 62. It is also elemental that a contract, if ambiguous, may be construed in the light of the surrounding facts and circumstances, and the situation of the parties at the time it was executed.

■ I am convinced that the services it was contemplated Keller would render were in fact sales services to be performed in the Chicago area. His contemplated duties did not include professional engineering services to be rendered in the State of Wisconsin. The fact that he may from time to time have offered some advice with reference to the kind of machinery to be used or the manner of using same was merely incidental. In enacting the statute in question the legislature was concerned with protecting the public welfare and safeguarding the life, health and property of citizens in this State. It certainly was not their intent to require anyone who might operate machines or tools and equipment in a machine shop or who even might supervise the operation of same to obtain a license as a professional engineer. Although the word "engineering" appears in the heading of the agreement it nowhere appears in the body of the instrument, and I hold that the plaintiff is not barred by reason of the statute.

■ I am of the opinion that plaintiff is entitled to a commission on orders received from Amertorp Corporation (St. Louis Plant). Defendant admits plaintiff was responsible for orders from Amertorp Corporation (Forest Park Plant), which preceded the orders from the St. Louis Plant which were listed in the statement. Baumgartner stated in his letter to Keller of the same date that these were "orders secured through your efforts." The parties thus construed the agreement to mean that the orders from the same corporate entity were the important factor and that no distinction was to be made as to the separate plants.

Keller also brought Lear-Avia, Inc., and Reliable together. The business which defendant obtained was due at least indirectly to Keller's efforts and he is entitled to a commission on such business. Similarly plaintiff is entitled to be paid a commission on the one order from Universal Paper Products Company.

■ The important orders in the case are the two large orders received from Pullman. Defendant does not dispute that plaintiff was instrumental in their obtaining the first three orders from this company. Plaintiff relies on the fifth paragraph of the contract, contending that the two large subsequent orders are, in the language of the contract, "subsequent orders, from the same sources." But the contract must be construed as a whole. Defendant employed plaintiff "to represent us in connection with such services as we elect to make available to you." Defendant agreed to pay a commission to plaintiff "on orders secured directly or indirectly through your efforts."

If Pullman had merely dealt direct with defendant after the plaintiff had originally brought them together, the latter would be entitled to his commission as the business would have resulted at least indirectly through his efforts. But here Pullman, through Mr. Bradley, announced definitely it would give no orders to the defendant if the plaintiff were in the picture or were to receive a commission on the business. How then can it be said that the subsequent orders were due even indirectly to plaintiff's efforts? The fact is that any such orders were in spite of the plaintiff and not in any way due to his efforts.

Of course Mr. Bradley was not the Pullman Company, but so far as the records in this case disclose he had the final authority whether the defendant would receive the last two orders which are here in question. The condition Bradley laid down was that plaintiff must be out of the picture if further orders were to be forthcoming. No suggestion of collusion between Bradley and the defendant appears. Confronted with Bradley's ultimatum the defendant had the right under the contract to exclude the plaintiff, for the contract stated that the plaintiff was employed to represent defendant "in connection with such services as we elect to make available to you."

■ Plaintiff contends that defendant had an oral agreement with him that he was to be paid his commissions on Pullman busi-

ness in any event, and that such agreement was kept secret from Bradley. However, plaintiff had the burden of proof to establish any such agreement and he has failed to do so in this case.

The remaining question pertains to the attempted termination of the contract. The contract provides: "The term of this agreement shall be for one year from the date of your acceptance (August 17, 1943) and it shall continue in full force and effect thereafter until terminated by either party on ninety (90) days written notice. * * *" I construe this provision to mean that the contract was to remain in full force and effect for a minimum of one year. I am of the opinion that the notice of cancellation given by defendant on February 28, 1944, was sufficient to terminate the contract at the end of the one year period.

Plaintiff is entitled to judgment for his commissions on the items as heretofore indicated, less $724, the amount of the Todd and Brown, Inc., remittance which he has retained, as well as any other credits to which the defendant may be entitled on the account.